**RAILROAD COMMISSION of Texas et al.,**
**Petitioners,**

v.

**ALUMINUM COMPANY OF AMERICA**
**et al., Respondents.**

No. A–9760.

Supreme Court of Texas.

May 27, 1964.

Rehearing Denied July 15, 1964.

Waggoner Carr, Atty. Gen., Austin, Joseph Trimble and Linward Shivers, Asst. Attys. Gen., for Railroad Commission of Texas.

William H. Darden, Corpus Christi, Hart & Hart, Austin, William E. York, McAllen, for Coastal States Gas Producing Co., and others.

Wallace H. Scott, Jr., Houghton Brownlee, Jr., Austin, for Tex-Star Oil & Gas Corp'n and others.

Harry S. Pollard, Austin, Lee Jones, Jr., San Antonio, for Karankawa Producing Co., and others.

Miller B. Walker, Jr., Nick C. Nichols, Charles F. Cockrell, Jr., Levert J. Able, Houston, for Woods Exploration & Producing Co. and others.

Vinson, Elkins, Weems & Searls, Raybourne Thompson and James E. Allison, Jr., Houston, with above firm Clark, Thomas, Harris, Denius & Winters, James H. Keahey, Austin, with above firm. Charles F. Heidrick and Edwin M. Cage, Dallas, for Aluminum Co. of America and others.

CULVER, Justice.

Respondents, Aluminum Company of America, Crown Central Petroleum Corporation, Carl E. Siegesmund, and Sun Oil Company, (Alcoa et al.), in this suit attack and seek to set aside the Railroad Commission's order of April 24, 1961, allocating the allowable production of oil and gas in the Appling Field in Calhoun and Jackson Counties. This order prorates the production of gas on the basis of 1/3 per well and 2/3 on the acreage assigned to the well and prorates oil on a 50% per well and 50% acreage basis. The grounds of the attack are that this order results in and permits enormous drainage to town lot and other small tract wells from under respondents' lands and that this drainage will continue unless the Commission's order is set aside. Alcoa et al. assert that they own approximately 3,700 acres of the total productive area of the Middle Kopnicky reservoir and as of June 30, 1961, had 22 wells producing therefrom; that at the same time there were 30 town lot wells with total assigned area of 25 acres; that the average per well allowable for the small tracts is 43 times the average per acre allowable for standard unit tracts in the Middle Kopnicky. These allegations are proven without substantial dispute. A number of intervenors aligned themselves with the Railroad Commission in urging that the order be upheld. The trial court adjudged that the order of the Commission was not supported by substantial evidence, was therefore null and void and enjoined its enforcement. The Court of Civil Appeals affirmed. 368 S.W.2d 818. We here reverse the judgments of the courts below and hold the Commission's order to be valid.

The Appling Field consists of 10 separate sands for the most part overlying one another. All of these sands produce gas and condensate with a few small oil reservoirs interspersed. The principal sand, known as the Middle Kopnicky, is the deepest producing sand and by far the thickest and most prolific reservoir. It contains 80% of the gas reserves in the entire area. The nine other sands are progressively higher and overlie the producing area of the Middle Kopnicky. The discovery well in the Appling Field was completed as a gas producer in the Middle Kopnicky in 1953. In 1956 the Commission for the first time adopted for this field the gas allocation formula

of 1/3 per well and 2/3 per acreage. The order also provided for a 320-acre gas well spacing unit and a 40-acre oil well spacing unit. At that time several town lots or small tract wells had been drilled and were in production.

Thereafter and prior to January 19, 1960, the Commission promulgated at various times as the individual reservoirs were discovered, the same proration formula for each. No appeals were taken by Alcoa or by anyone else from any of these orders. In fact, the evidence shows that Alcoa during this period had at least once recommended that very same formula to the Commission for adoption.

On January 19, 1960, Alcoa et al., petitioned the Commission to hold a hearing and to revise the oil and gas allocation formulas for these reservoirs which the Commission had theretofore promulgated. After hearings were held and the matter considered at length the Commission entered the order here under attack. It recited that the rules theretofore adopted should be revised and redrawn into one single order for all of the reservoirs and that all former orders were superseded and rescinded. By the terms of that order, however, the Commission refused to modify or change in any way the proration order which had first been promulgated in 1956 or any of the eight subsequent special field orders and expressly continued in force the 1/3–2/3 formula. It may be noted here that the amount of oil reserves in the field is negligible and the parties have concerned themselves, therefore, almost exclusively with the matter of the gas reservoirs and the formula applicable thereto.

The principal point argued by the Commission and its aligned intervenors is that the evidence shows as a matter of law that Alcoa et al. were barred by unreasonable delay, laches and estoppel from seeking to set aside and revoke the order continuing the 1/3–2/3 allocation formula for gas production, and that the courts below

erred in holding that these defenses are not applicable to suits attacking proration orders of the Railroad Commission. Their position is based primarily on the statement in our decision commonly referred to as the Normanna [1] case as follows:

"We are in agreement with the reasoning of the courts in the Humble and Standard Oil Company cases in holding that where producers have acquiesced in and have failed to complain of the Commission's proration orders for a long period, during which time other operators have expended vast sums in exploration and drilling operations, such producers should not be heard to complain."

While this statement is properly to be regarded as dictum since it was not necessary to the decision in the case, nevertheless it was said deliberately, to put the Commission and the industry as a whole on notice that the holding therein did not require the overturning of proration formulas that had been in effect in other fields for years where operators had drilled and completed wells at great expense in reliance on those formulas and where conditions had become stabilized. Otherwise, not only would confusion and serious injustice result in many instances, but an intolerable burden would be cast upon the Commission. Thousands of producing wells have been drilled on small tracts in Texas oil fields as exceptions to Rule 37 in hundreds of fields in which the 1/3–2/3 formula has been adopted and which tracts have produced far more hydrocarbons than underlaid those tracts originally. There are said to be more than 300 productive gas fields in the State which are now and have been currently operating under this formula.

The question decided in Normanna was for the first time squarely presented to this Court. We there held that the 1/3–2/3 proration formula promulgated by the

---

1. Atlantic Refining Co. v. Railroad Commission of Texas, 162 Tex. 274, 346 S.W.2d 801, 811.

Commission for the Normanna Field was invalid because it allowed a well on a .3-acre tract to produce gas at a rate many times greater per acre than a well on a standard spacing unit. It did not come close to ratable production nor did it afford each operator in the field an opportunity to produce his fair share of the gas from the reservoir. On the contrary it would result in the uncompensated drainage of a tremendous quantity of gas and condensate from other leases and tracts in that field to the small tract upon which the defendant had drilled its well.

The theory of the Normanna decision as expressed in the quoted language is that its holding is to be applied prospectively and not retrospectively. This prospective application of Normanna is in harmony with the statute[2] which authorizes appeals from any rule, regulation or order promulgated by the Commission. Although this statute fixes no time limit for an appeal, yet by providing that such suits shall be advanced for trial and be determined as expeditiously as possible, and that no postponement or continuance shall be granted except for reasons deemed imperative, it clearly evidences a legislative intent that those suits must be brought within a reasonable time. Dunbar v. Fuller, Tex.Civ.App., 253 S.W.2d 684, writ ref.; Midas Oil Co. v. Stanolind Oil Co., 142 Tex. 417, 179 S.W.2d 243; Board of Water Engineers v. Colorado River Municipal Water District, 152 Tex. 77, 254 S.W.2d 369. In the last case where no appellate steps were taken for a period of seven months, the appeal was held to be untimely, even though the Board order may not have been reasonably supported by substantial evidence and had the appellees proceeded with diligence, they might have been enabled to obtain the relief sought.

Alcoa insists that the decisions such as Midas Oil Co. v. Stanolind have no application to the problem here presented because there is a basic difference between a Commission order establishing a field-wide allocation rule and an order granting an exception to a Rule 37 permit in that the granting of the permit fixes a vested right while the allocation orders do not. We concede that distinction, but nevertheless we believe the law, as announced therein, is pertinent to the facts here.

■ Unquestionably the Commission's power to regulate oil and gas production in the interest of conservation and protection of correlative rights is a continuing one and its orders are subject to change or modification where conditions have changed materially, new and unforeseen problems arise or mistakes are discovered. Magnolia Petroleum Co. v. New Process Production Co., 129 Tex. 617, 104 S.W. 2d 1106; Railroad Commission v. Humble Oil & Refining Co., Tex.Civ.App., 193 S. W.2d 824, writ ref. n. r. e. It is equally true that no landowner or operator acquires any vested right to continue to produce the same amount of oil or gas during the life of such well as was fixed by the proration schedule in force at the time he drilled his well. The regulation of the production of oil and gas is a valid exercise of the state police power. Texas Trading Co. v. Stanolind Oil & Gas Co., Tex.Civ.App., 161 S.W.2d 1046; Railroad Commission v. Rowan & Nichols Oil Co., 310 U.S. 573, 60 S.Ct. 1021, 84 L.Ed. 1368.

■ What we do say is, however, that in appealing from any order of the Railroad Commission one must proceed with reasonable diligence. The course pursued by Alcoa in this case in moving for a modification of the long-standing 1/3–2/3 formula and then taking an appeal from a denial of that motion for all practical purposes, and so far as the interests of the parties are concerned, differs in no material respect from a present attempt to appeal from the original 1956 order and the ones that followed. Alcoa had

2. Vernon's Ann.Civ.Stat., Art. 6049c, § 8.

the right to seek a revision of these orders, but only upon a showing of changed conditions and a resultant necessity therefor.

■ There have been no material changes nor have unforeseen problems arisen, affecting proration in the Appling Field, that in our opinion would compel the Railroad Commission to modify or rescind the proration orders promulgated prior to January 19, 1960. As pointed out above, the effect of the Commission's order complained of here was merely the refusal to set aside the orders that had theretofore been adopted. At the time of the first field proration order in 1956 it appears that five wells had been drilled in the area on small tracts. This drilling under the Rule 37 exception continued until thirty wells had been brought into production prior to May 18, 1959, and others had been completed before Alcoa filed its application before the Board. The cost of drilling per well ranged from ninety to two hundred thousand dollars. From the testimony it appears that Alcoa could reasonably have concluded in 1956 that many town-lot tracts lay within the proven territory. Alcoa knew that as a matter of law each town-lot owner, or at least many of them, would in all probability be entitled to one well as exceptions to Rule 37.

Beginning in 1954 there were negotiations between Alcoa et al. and some of the small-tract owners concerning the matter of pooling and unitization. There is evidence to the effect that Alcoa and its associates refused some such offers from small-tract owners. There is evidence that the Carancahua Townsite in 1955 was surrounded by four or five wells that had been drilled by Alcoa which indicated that the townsite was a proven potential area for production and that the area was being drained by the Alcoa wells at that time.

Likewise there were negotiations between the intervenor, Sun Oil Company, and some town-lot owners in the Port Alto

Subdivision looking to unitization and pooling agreements. These two town-lot areas spread over about 150 acres and were divided into more than 200 lots. All of these facts undoubtedly were fully known to Alcoa and the other respondents at the time of the promulgation of the first order in 1956 and they must have fully appreciated the almost certain probability of the drainage that would necessarily follow from completions on town lots in the productive area.

It is true that a number of these town-lot wells owned by some of the petitioner-intervenors have been drilled and brought into production subsequently to January 19, 1960, when Alcoa et al. first applied to the Commission for a revision and modification of the existing proration orders. In fact all of the wells of two of these intervenors had been so drilled. Three of these intervenors had completed all of their wells earlier. But the fact that some of these wells were drilled after they were put on notice of Alcoa's application is not material to a solution of the problem here. It could not affect adversely those operators whose wells were drilled earlier. We are dealing here with a field-wide rule. Whether or not there is any authority vested in the Commission to apply exceptions to a field-wide rule in some cases, that relief is not here sought by Alcoa. They seek to strike down the order as applicable to the entire field.

In Standard Oil Co. v. Railroad Commission, Tex.Civ.App., 215 S.W.2d 633, n. r. e., Standard filed its application with the Commission seeking a modification of the Yates Field proration formula which had remained in effect without substantial change for nearly nine years theretofore. On page 638 of that opinion the Court points out:

"* * * From the very nature of a proration formula, and the magnitude of the interests therein, both public and private, it ineluctably follows that the Commission has the affirma-

tive right, when challenged in an appropriate judicial proceeding, to have its validity established, and the continuing uncertainty removed, which would result from the untrammeled right of the challenging party, from whatever cause, to bring its validity (except for changed conditions) again in issue. * * *"

From that premise Alcoa et al. argue that laches and delay do not apply to field-wide proration orders in that, they say, the Court holds that Standard had the "untrammeled right" to attack the order on any grounds and at any time they saw fit. We do not agree with that argument. Standard's principal contention in that cause was that having moved for a non-suit it was entitled as a matter of law to a dismissal of the entire suit without prejudice. The Court held, however, that the Commission having prayed that these orders be sustained, it was entitled to a judicial determination of their validity to set at rest any uncertainty in that respect. The Court is not saying, as we construe its language, that Standard after long delay does have the untrammeled right to put in issue the validity of the proration formula absent changed conditions.

 Alcoa et al. contend that there is no evidence to show that any well owner on any small tract in this field has failed to obtain already from his allotted production the entire cost of his drilling and maintenance operations, together with some profit, and therefore it would be wholly unfair and unjust to permit a continuation of drainage from their properties which has up to the present time and will in the future result in a total loss to them of gas and condensate to the value of several million dollars. Even this argument, persuasive as it is, does not convince us that this Court should interfere with the administration by the Railroad Commission of the production from this field where small tract drilling has been conducted and large sums expended in re-

liance on the formula that had been in force without objection for a period of four years.

 There are many reasons why stability in respect to proration formulas is vital to the well being of the industry as a whole, to the property owners in the field and to the public at large. It is a matter of common knowledge that well owners are not alone concerned. Individuals and institutions have invested in royalties and in other oil and gas interests. Loans have been made with these properties as security, and taxes have been levied by various municipal and school authorities. It is well known that the economy of the whole state rests to a large extent on the oil and gas business.

For the reasons above expressed we uphold the Railroad Commission's order of April 24, 1961. The judgments of the trial court and the Court of Civil Appeals are reversed and judgment here rendered that respondents take nothing.