**WOODS EXPLORATION & PRODUCING CO., Inc., et al.**

v.

**ALUMINUM COMPANY OF AMERICA et al.**

**Civ. A. No. 14669.**

United States District Court
S. D. Texas,
Houston Division.

March 29, 1968.

**584**

---

Arthur Mandel, of Mandel & Wright, and Levert J. Able, Houston, Tex., for plaintiffs.

Ross N. Sterling and Leroy Jeffers, of Vinson, Elkins, Weems & Searls, Houston, Tex., for defendants.

## Memorandum and Order

SINGLETON, District Judge.

In December, 1962, plaintiffs, Woods Exploration & Producing Company, Stanley C. Woods, and Southeastern Pipe Line Company, filed the instant antitrust action against defendants, Aluminum Company of America, Crown Petroleum Corporation, and Lavaca Pipe Line Company,[1] seeking injunctive relief and treble damages for alleged violations of the Sherman and Clayton Antitrust Acts, 15 U.S.C. §§ 1, 2, 15, 26 (1964). By their complaint, plaintiffs charged that defendants had restrained trade in the production and marketing of natural gas from the Appling Gas Field in Jackson and Calhoun Counties, Texas, and that defendants had monopolized and/or attempted to monopolize the production and marketing of gas from the field. Plaintiffs sought to recover as damages the loss of production from their wells in the field which had been occasioned by the entry of orders by the Texas Railroad Commission setting production allowables for plaintiffs' wells at levels lower than plaintiffs thought they should have received. Plaintiffs sought to hold defendants liable for this loss on the ground that the Railroad Commission orders had been based, at least in part, on false nomination forecasts and reports filed by defendants with the Commission.

Defendants responded with a motion to dismiss for failure to state a claim, and, in the alternative, a motion for summary judgment. Both motions were overruled by another judge of this district, Woods Exploration & Producing Co. v. Aluminum Company of America, 36 F.R.D. 107 (S.D.Tex.1963), and in October, 1963, the Court of Appeals for the Fifth Circuit denied with the following order defendants' attempted interlocutory appeal from the order overruling their motion to dismiss.

> "Since the order sought to be reviewed is merely the denial of a motion to dismiss the complaint, leave to take interlocutory appeal should be, and it is hereby DENIED, *but without prejudice to an application in the future from any appropriate order made by the District Court after completion of pretrial discovery or other pretrial procedures revealing the factual basis for the respective claims and defenses as distinguished from mere pleadings."* (Emphasis Added.)

---

1. Plaintiffs also named as defendants certain employees of the defendant corporations. By stipulation and through the filing of their Third Amended Complaint, however, plaintiffs have dropped these parties as defendants.

In 1966, the case was transferred to this court as a docket equalization measure. Now, after the completion of extensive pretrial discovery, defendants have again moved for summary judgment. After reviewing thoroughly the numerous briefs filed by each side, as well as conducting an oral hearing on the motion, I feel compelled to disagree with the conclusion reached by my brother judge in his 1963 decision.

 Before proceeding to the merits of the motion, however, I feel some comment is in order regarding plaintiffs' contention that this Court is without the power to entertain the motion—that the prior ruling by a different judge has become the law of the case. In view of the fact that I reach the merits, needless to say I disagree. The wording of the appellate court order seems to invite the current motion, and, moreover, the law does not require a judge who will ultimately handle a case to decline to make an independent and objective determination of issues which are properly raised. Rather, whether to go into the merits of a question previously decided in a case prior to final judgment is a matter within the considered discretion of the judge. See Beedy v. Washington Water Power Co., 238 F.2d 123, 127 (9th Cir. 1956). See also 3 Barron & Holtzoff, Federal Practice & Procedure § 1192 (Wright ed. Supp. 1966); 1B Moore, Federal Practice, Para. 0.404[4], at 452. As stated by the Court in Ward v. Louisiana Wildlife Comm'n., 224 F.Supp. 252 (E.D.La. 1963),

"A United States district judge is most reluctant to reverse or change a ruling or order of another district judge, sitting on the same case, in the same court, and will do so only for the most compelling reasons. However, *the authority of a judge to overrule a previous decision of a prior judge, sitting on the same case in the same court is well established * * *. The United States Supreme Court has rejected a doctrine of disability at self correction * * *." Id. at 255. (Emphasis Added.)*

By amended complaint, plaintiffs have now specified various other activities of the defendants taken pursuant to the alleged conspiracy. In large part, these allegations relate to a course of litigation either initiated by defendants or which was brought about by defendants' successful efforts to influence the Railroad Commission in setting field orders which applied to the Appling Field. Since the same basic principles which apply to the allegations concerning the filing of false nominations apply alike to the latter allegations, they will also be considered.

 After reviewing the numerous depositions and papers filed in the case, it is clear that there are disputed issues of fact on whether defendants actually conspired together and whether they deliberately filed the false nominations or brought about the litigation in question as part of a conspiracy. However, even if plaintiffs' allegations in these respects are true, plaintiffs would still not be entitled to recover damages for these activities. Thus for the purposes of this motion, I accept plaintiffs' basic allegations as true. Liberty Leasing Co., Inc. v. Hillsum Sales Corp., 380 F.2d 1013, 1014–15 (5th Cir. 1967).

## FILING OF FALSE NOMINATIONS
### A. *The Factual Context.*

 Plaintiffs own, operate, or have an economic interest in wells drilled on small tracts located within a fifty-nine acre area lying in the heart of the Appling Gas Field. Most of plaintiffs' wells have been drilled as exceptions to the general spacing rule which restricts the drilling of wells to one well every 320 acres.[2] Defendants, on the other hand,

---

**2.** Statewide Rule 37, Tex. R.R. Comm'n Rules & Regs. 1, at 15, Oil & Gas Rep. 1320 (1962). See generally Hardwicke & Woodward, Fair Share and the Small Tract in Texas, 41 Texas L.Rev. 75 (1962); Hardwicke, Oil-Well Spacing Regulations and Protection of Property

own or have an interest in wells which have been drilled on large tracts subject to the general spacing rule. The allowable production which each well in the field is permitted to produce is set monthly by order of the Texas Railroad Commission. For the purpose of preventing waste, the Commission is charged with the task of limiting total production from the field to the reasonable market demand for gas made upon the field. Tex.Rev.Civ.Stat.Ann. art. 6008 § 3(h) (1964). Each producing well is entitled to its fair share of the total allowable field production, *id.* § 12, an amount which has been held to be roughly equivalent to the gas in place under the tract on which the well is drilled.[3]

In the Appling Field, after first determining the total allowable for the field, the allowable for each well is determined by application of a one-third—two-third proration formula. One third of the field allowable is divided equally among the wells, and two-thirds is divided among the wells in the proportion to which the surface acreage on which the well is drilled bears to the combined surface acreage of all the wells in the field. The heavy weight given to the well factor by this formula has meant that producers with wells on small tracts have been permitted by the Commission to extract far more gas than that underlying their tracts, thereby draining gas from beneath the larger adjoining tracts.[4] The inequitable effect of the formula has been compounded, moreover, by the fact that many wells on large tracts, although producing at full capacity, have been unable to produce even the allowable as-

Rights in Texas, 31 Texas L.Rev. 99 (1952).

Most of plaintiffs' wells were drilled on extremely small tracts, some being located on tracts of less than $2/10$ of an acre. Defendants' First Brief in Support of Summary Judgment, p. 3; Plaintiffs' First Opposition Brief, p. 2. See generally Railroad Comm'n v. Aluminum Company of America, 380 S.W.2d 599 (Tex.1964), reversing 368 S.W.2d 818 (Tex.Civ.App.—Austin 1963).

3. Where the lessee or owner of a small tract has been granted a permit to drill a well as a Rule 37 exception, this means that "it is the duty of the commission to adjust the allowable, based upon the potential production, so as to give the owner of such smaller tract only his just proportion of the oil and gas. *By this method, each person will be entitled to recover a quantity of oil and gas substantially equivalent in amount to the recoverable oil and gas under his land.*" Brown v. Humble Oil & Ref. Co., 126 Tex. 296, 83 S.W.2d 935, 944 (1935). (Emphasis Added.) See also Manufacturer's Gas & Oil Co. v. Indiana Natural Gas & Oil Co., 155 Ind. 461, 57 N.E. 912, 50 L.R.A. 768 (1900). In some instances, and particularly in the Appling Field, this "ideal" allocation of gas has not been attained. See Notes 4 and 5 *infra.*

4. The one-third—two-third formula was declared invalid by the Texas Supreme

Court in Atlantic Ref. Co. v. Railroad Comm'n., 162 Tex. 274, 346 S.W.2d 801 (1962), on the ground that it allowed small-tract owners to produce more than their fair share and amounted to confiscation of gas underlying the large tracts. In Railroad Comm'n v. Aluminum Company of America, 380 S.W.2d 599 (Tex. 1964), however, the court upheld the formula insofar as it applied to the Appling Field on the ground that the large tract owners were guilty of laches in attacking it. Although the court recognized that small-tract owners had drained substantial quantities of gas from beneath the large tracts, and had recouped their costs and made a profit, and would during the life of the field drain several million dollars worth of gas from beneath tracts leased to Aluminum Company of America alone, id. at 604, it found other factors to be more persuasive.

"There are many reasons why stability in respect to proration formulas is vital to the well being of the industry as a whole, to the property owners in the field and to the public at large. It is a matter of common knowledge that well owners are not alone concerned. Individuals and institutions have invested in royalties and other oil and gas interests. Loans have been made with these properties as security, and taxes have been levied by various municipal and school authorities. It is well known that the economy of the whole state rests to a large extent on the oil and gas business." *Ibid.*

signed to them under the formula. As a result the amount they have been unable to produce has been allocated by the Commission to the small-tract wells not already producing at full capacity.[5] It is in this context that the plaintiffs complained of defendants' filing false production forecasts which reduced the total field allowable.

## B. *The Nomination Procedure.*

As previously stated, the total allowable for a field is set at what the Railroad Commission determines to be the reasonable market demand for the field's gas. No statutory provision prescribes the procedure by which market demand is to be determined, and thus the matter falls under the rule-making power of the Commission. The usual procedure which the Commission follows is set out in Statewide Rule 31. Under its provisions, market demand is ordinarily determined primarily on the basis of Producer's Forecasts filed with the Commission by operators having wells in the field. These nominations state the volume of gas which each producer expects to be able to market from his wells the following month. The nominations are totaled and, if the Commission concludes that their total accurately reflects market demand, the total becomes the field allowable to which the one-third—two-third formula is applied. If the Commission disagrees with the forecasts, however, it may consider other factors such as average production for the previous twelve months, or nominations filed by purchasers of gas. Railroad Comm'n v. Woods Exploration & Producing Co., 405 S.W.2d 313, 315 (Tex. 1966). In most instances in the Appling Field the producer's forecasts are corrected by the difference between the total of the current nominations and total actual production which was allowed for the second preceding month.[6]

5. Railroad Comm'n v. Woods Exploration & Producing Co., 405 S.W.2d 313, 316 (Tex.1966).

"An example will serve to illustrate the problem. One of the reservoirs in the Appling Field is designated as Segment 5, 7500' and 18 wells were completed therein. Seventeen of these wells were located on 7.132 acres, while the remaining well was situated on a 328 acre unit. * * * The total delivery capacity of all 18 wells was approximately 898,000 MCF per month, and the production forecasts resulted in the determination that reasonable market demand, and hence the reservoir allowable, for the month was approximately 880,000 MCF. Under the basic $\frac{1}{3}$—$\frac{2}{3}$ allocation formula, the large tract well was entitled to an allowable of 591,000 MCF. * * * The productive capacity of the single large tract well was only about 34,000 MCF, and in accordance with the usual Commission procedures some 557,000 MCF were allocated to the [small tract] wells * * * in addition to their shares of the reservoir allowable as determined by application of the $\frac{1}{3}$—$\frac{2}{3}$ formula." *Ibid.*

6. Under this method of determining the field allowable, the following calculations would be involved.

| | |
|---|---|
| (a) Total nominations for Second Preceding Month | 110 |
| Total allowable for non-prorated wells for Second Preceding Month | 20 |
| Total nominations for Prorated Wells for Second Preceding Month | 90 |
| Total Actual Production of Prorated Wells in Second Preceding Month | 80 |
| Difference | 10 |
| (b) Total Nominations for Current Month | 110 |
| Difference Between Total Nominations and Actual Production in Second Preceding Month | —10 |
| Total Field Allowable for Current Month for All Wells | 100 |

Tex. R.R. Comm'n Rules & Regs. Appendix, at 39; see Parris & Edgerton, Non-Associated Gas Proration 4 (1961). See also Weymouth v. Colorado Interstate Gas Co., 367 F.2d 84, 98–99 (5th Cir. 1966).

## C. *The Liability Issue.*

Whether plaintiffs can recover for the loss of production they allegedly suffered as a result of the low allowables set by the Railroad Commission involves a now rather undeveloped area of federal antitrust law. As state regulation of the economy increases, however, and particularly in the area of conservation, it can easily be predicted that many questions will arise similar to those raised in the instant case.[7]

 The starting point in this and any other antitrust case not involving a matter of per se illegality is Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 51–52, 31 S.Ct. 502, 55 L.Ed. 619 (1911), in which the Supreme Court announced the "rule of reason" as the test for determining the applicability of the antitrust laws to a given situation. Pursuant to this test, it has been held consistently that as a matter of statutory interpretation the Sherman Act does not apply to the actions of a state. As stated by the court in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943):

> "[There is] nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

> "The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state." Id. at 350–351, 63 S.Ct. at 313.

Accordingly, the states have been left free to regulate industries within their boundaries by curtailing competition or eliminating it altogether, Asheville Tobacco Board of Trade, Inc. v. FTC, 263 F.2d 502, 505 (4th Cir. 1959), subject only to the limitations inherent in the

---

7. In some instances, Congress has recognized that there is a basic conflict between the competitive thrust of the antitrust laws and the anticompetitive thrust of state regulatory schemes. For instance, in the area of insurance, Congress has sought to eliminate friction which might result because of simultaneous application of state and federal law.

> "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance * * * unless such Act *specifically* relates to the business of insurance: Provided, That * * * [the federal antitrust laws] shall be applicable to the business of insurance *to the extent that such business is not regulated by State law.*" (Emphasis Added.)

McCarran Ferguson Act, 15 U.S.C. § 1012(b) (1963); see Miley v. John Hancock Mut. Life Ins. Co., 148 F.Supp. 299 (D.Mass.1957). A comparable forthright approach to resolving similar conflicts in the oil and gas area would not be inappropriate, for there are many parallels between state regulation of both industries, state regulation of both being equally comprehensive and detailed.

The federal courts have been careful to avoid applying the Sherman Act where its application might conflict with the Federal Power Commission's regulation of the natural gas industry. Interstate Nat. Gas Co. v. Southern California Gas Co., 102 F.Supp. 685, 103 F.Supp. 317 (S.D.Cal.1952), aff'd, 209 F.2d 380 (9th Cir. 1953). Moreover, the activities made the subject matter of the instant suit involve Railroad Commission regulations concerning the production and gathering of natural gas from the Appling Field, and this subject Congress has chosen to exempt from federal supervision in favor of state regulation. Natural Gas Act, 15 U.S.C. § 717(b) (1963). Therefore, since these activities are subject to exclusive regulation by the Texas Railroad Commission, a like caution and deference should be shown when the alleged Sherman Act violation involves Railroad Commission regulations and matters subject to the Commission's exclusive jurisdiction.

commerce clause or any restrictions imposed by federal statutes. However, when a private party as opposed to a state itself has been sought to be held liable for damages resulting from restraints imposed by a state, the cases reflect more than a little uncertainty on whether, and in what situations, the private party whose improper conduct is the reason the state has imposed a trade restraint is immune simply because the restraint was imposed by the state.[8]

In Eastern Railroad Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), forty-one Pennsylvania truckers and their trade association brought suit against twenty-four railroads and an association composed of the presidents of each railroad. The truckers charged that the railroads had conspired to restrain trade in and monopolize the long-distance freight business in violation of the Sherman Act. The essence of the conspiracy was that the railroads had conducted a publicity campaign against the truckers designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business. The campaign proved successful, for the railroads persuaded the governor of the state to veto a "Fair Truck Bill" which would have permitted the truckers to haul heavier loads over the state's highways. Moreover, the publicity campaign had the additional effect of destroying much of the truckers' good will. The district court found that the publicity campaign was fraudulent and malicious and that its sole purpose was to destroy the truckers as competitors even though no legislation was secured. For this reason, it awarded substantial damages for the truckers' loss of good will. However, the district court was also of the view that restraints of trade and monopolizations resulting from valid governmental action are not actionable under the Sherman Act and thus refused to award damages for the loss of business caused by veto of the "Fair Truck Bill." Noerr Motor Freight, Inc. v. Eastern Railroad President's Conf., 166 F.Supp. 163, 172–73 (E.D.Pa.1958). The Court of Appeals affirmed with one judge dissenting. Eastern Railroad President's Conf. v. Noerr Motor Freight, Inc., 273 F.2d 218 (3d Cir. 1959). Applying the "rule of reason", however, the Supreme Court reversed, holding that the truckers could as a matter of law recover no damages for injury sustained because of the efforts of the railroads to influence governmental action.

In reaching this result, the Court noted that there was an "essential dissimilarity" between the lobbying activities conducted by the railroads and the activities normally prohibited by the Act, and that to impose liability for this conduct would raise serious constitutional questions and political difficulties.

"We think it * * * clear that the Sherman Act does not prohibit two or more persons from associating together in an attempt *to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly.* * * * [The railroads' activities] bear very little if any resem-

---

8. For example, in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), Eastern Railroad President's Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), three cases which were finally decided in the Supreme Court, the lower courts were reversed for imposing liability. Also, there appears to be a conflict on whether joinder of the state official who uses his office to impose the restraint makes a difference on whether the private party can be held liable. *Compare* Harman v. Valley Nat'l Bank of Arizona, 339 F.2d 564 (9th Cir. 1964), *with* Miley v. John Hancock Mut. Life Ins. Co., 148 F.Supp. 299 (D.Mass.1957). See also E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority, 362 F.2d 52 (1st Cir. 1966). In the instant action, there is no issue concerning the liability of the Railroad Commission or any individual member thereof.

blance to the combinations normally held violative of the Sherman Act, combinations ordinarily characterized by an express or implied agreement or understanding that the participants will jointly give up their trade freedom, or help one another to take away the trade freedom of others through the use of such devices as price-fixing agreements, boycotts, market-division agreements, and other similar arrangements. This essential dissimilarity between an agreement jointly to seek legislation or *law enforcement* and the agreements traditionally condemned by § 1 of the Act, even if not itself conclusive on the question of the applicability of the Act, does constitute a warning against treating the defendants' conduct as though it amounted to a common-law trade restraint. * * * [Moreover, to impose liability] would substantially impair the power of government to take actions through its legislature and executive that operate to restrain trade. * * * To hold that the government retains the power to act in this representative capacity and yet hold * * * that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act. Secondly, and of at least equal significance, such a construction of the Sherman Act would raise important constitutional questions. The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." Id. 365 U.S. at 136–138, 81 S.Ct. at 529. (Emphasis Added.)

■ Plaintiffs seek to distinguish *Noerr* on the ground that it exempts only "political activity" from the scope of the Sherman Act and thus is not controlling for, they contend, the filing of false nominations is properly "business activity" and not "political activity" protected by *Noerr*. This proffered distinction, I think, places more emphasis than is warranted on the phrase "political activity" as used by the Court in *Noerr*. Plaintiffs contend that protected "political activity" encompasses only lobbying activities or influence peddling and does not apply to a situation such as this where the defendants and all other producers are required by Commission regulations to submit nominations under oath. There is some doubt whether this line of reasoning is accurate. In Sterling Nelson & Sons, Inc. v. Rangen, Inc., 235 F.Supp. 393, 400 (D.Idaho 1964), for example, the Court held that there was no liability even though the defendant had bribed a state official to use his position to impose a trade restraint harmful to the plaintiff. In addition, it has been held in other cases that there is no liability although the conduct complained of violates a valid state penal statute [9] or even though the conduct gives rise to a civil cause of action under state law.[10] If activities of this character are not within the ambit of the antitrust laws, then it is difficult to perceive how the activities of the defendants here can be viewed differently. However, it is unnecessary to resolve the issue on a determination that the filing of false nominations is or is not political activity. The mere manipulation of labels does not determine the outcome of this case, for as made clear by other cases, liability is precluded if the restraint complained of results from otherwise valid govern-

9. *E. g.*, Apex Hosiery Co. v. Leader, 310 U.S. 469, 483, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); Parmelee Transportation Co. v. Keeshin, 292 F.2d 794 (7th Cir. 1961); Schenley Industries, Inc. v. New Jersey Wine & Spirit Wholesalers Ass'n., 272 F.Supp. 872 (D.N.J.1967).

10. *E. g.*, Hunt v. Crumbock, 325 U.S. 821, 826, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945); Apex Hosiery Co. v. Leader, *supra* note 9, 310 U.S. at 483, 60 S.Ct. 982; Norville v. Globe Oil & Ref. Co., 303 F.2d 281 (1962); Parmelee Transportation Co. v. Keeshin, *supra* note 9, 292 F.2d at 804; Sterling Nelson & Sons, Inc. v. Rangen, Inc., *supra*, 235 F.Supp. at 400.

mental action even though brought about by the improper conduct of a private party.

Plaintiffs' limited construction of *Noerr* ignores the fact that the Supreme Court did not disapprove the district court's holding that the truckers could recover no damages for injury resulting from any valid action of the state. See 365 U.S. at 135–136, 60 S.Ct. 982. In Parker v. Brown, supra, and United States v. Rock Royal Cooperative, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1938), the Supreme Court had previously upheld government regulatory schemes involving the production and marketing of milk and raisins even though the schemes permitted and required some participation by the producers affected. In both cases, the Court held that the regulation itself was not invalid because it constituted a restraint on trade and also that the producers who were benefitted by the regulation and who were instrumental in initiating it could not be held liable in damages.

In United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed. 2d 626 (1965), decided four years after *Noerr*, the Mineworkers' Union and several large coal producers conspired to drive smaller coal producers out of business. In furtherance of the conspiracy, they persuaded the Secretary of Labor to set a higher minimum wage for the employees of coal producers selling to the TVA and induced the officials of the TVA itself to reduce the number of the TVA's "spot market" purchases—many of which were exempt from the minimum wage requirements of the Walsh-Healey Act. The district court awarded substantial damages, and the court of appeals affirmed, distinguishing *Noerr* on the ground that although the conduct complained of might be lawful when standing alone, it became unlawful when shown to be a constituent part of a larger, unlawful conspiracy. Pennington v. United Mine Workers, 325 F.2d 804 (6th Cir. 1963). The Supreme Court reversed, but in doing so chose not to rest its decision alone on the ground

that the activity was protected "political activity" within thhe meaning of *Noerr*. Rather, the Court went further and interpreted *Noerr* more broadly:

"There is another reason for remanding this case for further proceedings in the lower courts. *It is clear under Noerr that Phillips could not collect any damages under the Sherman Act for any injury which it suffered from the action of the Secretary of Labor.* The conduct of the union and the operators did not violate the Act, the action taken to set a minimum wage for government purchases of coal was the act of a public official who is not claimed to be a co-conspirator, *and the jury should have been instructed, as UMW requested, to exclude any damages which Phillips may have suffered as a result of the Secretary's Walsh-Healey determinations.*" *Id.* 381 U.S. at 671, 85 S.Ct. at 1594. (Emphasis Added.) See also United States v. Johns-Manville Corp., 259 F.Supp. 440 (E.D.Pa.1966).

Perhaps of even more significance than this statement in the opinion is the fact that the Court cited with approval the decision of the court of appeals in Okefenokee Rural Elec. Membership Corp. v. Florida Power & Light Co., 214 F.2d 413 (5th Cir. 1954), a case which is closely in point with the instant action. In *Okefenokee*, the plaintiff brought suit against Florida Light & Power Company and the City of Jacksonville, Florida, alleging that these defendants had "engaged in an unlawful combination and conspiracy to monopolize and exercise exclusive control over the territory" into which plaintiff was seeking to extend electric power lines. The only feasible route from an engineering and economic standpoint along which a new power line could be built lay along Federal Highway 17. On January 25, 1952, plaintiff staked a proposed line along the highway, and on February 26, 1952 it applied to the Florida State Road Department for permission to construct a line along the route. During this period, however, the defendants constructed a "spite line"

along the same route for the sole purpose of defeating plaintiff's application for a permit. Only two persons could be served by the defendants' spite line, and indeed the only wire placed on the line by the City was a "neutral strand." In pursuance of the conspiracy, the City made a false argument before the Road Department that a line had already been constructed and that no new line should be built. As a result of these two actions, the Road Department denied plaintiff's application. Moreover, the defendants conducted a smear campaign against plaintiff, thereby causing the County Commissioners of Duval County to pass discriminatory regulations applicable only to plaintiff and designed to prohibit plaintiff from operating in Duval County. The district court dismissed the complaint for failure to state a claim. The court of appeals affirmed, reasoning that since the plaintiff had no right to use the highway route without a permit from the state nor any route along the county roads without permission of the Board of County Commissioners, the plaintiff had suffered no "legal injury."

■ I think the principle announced in *Pennington* and *Okefenokee* is controlling as to the damages plaintiffs allegedly suffered because of the allowables set by the Railroad Commission. Plaintiffs, however, have advanced two contentions as a basis for taking their action outside the scope of these precedents. First, they seek to distinguish *Okefenokee* on its facts, but this they have not successfully done. Plaintiffs contend that *Okefenokee* is distinguishable because they have been granted a permit to drill and produce gas whereas the plaintiff in *Okefenokee* was injured because of the state's refusal to grant a permit. This distinction is tenuous at best, for its thrust is to limit *Okefenokee's* application to cases involving the denial of permits by state agencies, a limitation which is inconsistent with the Court's reasoning. As stated by Judge Biggs, "implicit in [the *Okefenokee*] ruling is the legal conclusion that liability under the Sherman Act cannot be sustained by

virtue of official action of a State agency, *however inspired by the acts of an individual.*" Eastern Railroad President's Conf. v. Noerr Motor Freight, Inc., 273 F.2d 218, 226 (3d Cir. 1959) (dissenting opinion) (Emphasis Added.) Moreover, there are two crucial similarities between the two cases. In both, the injury complained of resulted directly from specific action taken by a state administrative agency on the basis of false information provided by private parties. Secondly, just as certainly as the plaintiff in *Okefenokee* had no legal right to use a particular route for the construction of a power line without the consent of the State of Florida, the plaintiffs here have no legal right to produce an amount of gas in excess of the specific allowable assigned to them by the State of Texas acting through the Railroad Commission. See Tex.Rev.Civ.Stat.Ann. art. 6008 § 16 (1964).

Plaintiffs' second contention is that, since each producer is required by the Railroad Commission to submit production forecasts under oath so as to provide information on the basis of which the Commission sets allowables, the producers are in effect possessed of broad discretionary powers by which they set the allowables themselves and thus the case is controlled by Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

In *Continental Ore,* the plaintiff brought suit against several American corporate defendants alleging that they had conspired to restrain trade and commerce in the production and selling of vanadium and that they had conspired to monopolize the vanadium market. Among other elements of damages, plaintiff sought to recover damages which it had suffered by being eliminated from competition in the Canadian market. After Canada's entry into World War II, the Canadian Government had taken measures to assure the maximum availability of strategic metals to private Canadian industries engaged in the war effort. The Office of Metals Controller was established and given broad powers

to regulate the procurement of materials and to allocate them to industrial uses. The Metals Controller delegated to a Canadian corporation, a wholly owned subsidiary of one of the defendants, the discretionary power to purchase vanadium and to allocate them to industrial users. In pursuance of the conspiracy, the parent corporation directed its subsidiary in making vanadium purchases so that the plaintiff lost all its customers and was eliminated from the Canadian market. The district court refused to award damages for this injury, and the court of appeals affirmed. Continental Ore Co. v. Union Carbide & Carbon Corp., 289 F.2d 86 (9th Cir. 1961). The Supreme Court, however, reversed, and with a unanimous opinion held that the parent's use of the subsidiary's discretionary power as the agent of a foreign state in order to drive a competitor out of business was actionable under the antitrust laws.

In speaking to the defendants' contention that they could not be held liable because the injury was inflicted by an agent of a foreign state, the Court stated:

> "What the petitioners here contend is that the respondents are liable for actions which they themselves jointly took, as part of their unlawful conspiracy, to influence or to direct the elimination of Continental from the Canadian market. * * * From the evidence which petitioners offered it appears that Continental complained to the Canadian Metals Controller that Continental had lost its Canadian business. * * * *But there is no indication that the Controller or any other official within the structure of the Canadian Government approved or would have approved of joint efforts to monopolize the production and sale of vanadium or directed that purchases from Continental be stopped. The exclusion Continental claims, resulted from the action of Electro Met of Canada [the subsidiary], taken within the area of its discretionary powers granted by the Metals Controller and in concert with or under direction of*

*the respondents."* Id. 370 U.S. at page 706, 82 S.Ct. at page 1414. (Emphasis Added.)

Unlike *Continental Ore,* however, the defendants here have been delegated no discretionary power to set gas production allowables in the Appling Field. The Texas Supreme Court made clear in Railroad Comm'n v. Woods Exploration & Producing Co., 405 S.W.2d 313 (Tex. 1966), that the Commission alone has the power and the duty to set allowables. The procedure followed by the Commission of requiring the producers to submit forecasts before the allowables are set is no more than a mere "administrative device." *Id.* at 319. The figures submitted by the individual producers are not binding on the Commission, and it does not have to set allowables based on their mathematical total. Thus any injury which *any* producer claims to have suffered because of the allowable assigned to him is an injury directly inflicted by the Railroad Commission and not an injury inflicted by his fellow producers directly or through the exercise of any discretionary power conferred upon them by the State.

The injury which plaintiffs complain to have suffered here because of the allowables assigned by the Railroad Commission falls under the definition of state action set forth in Parker v. Brown, *supra,* and thus does not constitute a recoverable element of damages in a federal antitrust action.

> *"It is the state which has created the machinery for establishing the prorate program.* Although the organization of a prorate zone is proposed by producers, and a prorate program, approved by the Commission, must also be approved by a referendum of producers, *it is the state, acting through the Commission, which adopts the program and which enforces it with penal sanctions, in the execution of a governmental policy.* The prerequisite approval of the program upon referendum by a prescribed number of producers is not the imposition by them of their will upon the minority by

force of agreement or combination which the Sherman Act prohibits. *The state itself exercises its * * * authority in making the regulation and in prescribing the conditions of its application." Id.* 317 U.S. at 352, 63 S.Ct. at 314. (Emphasis Added.)

As noted by the court of appeals for the Fourth Circuit:

"The teaching of Parker v. Brown is that the antitrust laws are directed againt individual and not state action. When a state has a public policy against free competition in an industry important to it, the state may regulate that industry in order to control or, in a proper case, to eliminate competition therein. It may even permit persons subject to such control to participate in the regulation, provided their activities are adequately supervised by independent state officials." Asheville Tobacco Board of Trade, Inc. v. FTC, 263 F.2d 502, 509 (4th Cir. 1959).

The scheme for setting allowables is adequately controlled by the Railroad Commission, and under state law the plaintiffs have effective remedies to protect them against any adverse effects which might flow from the filing of false nominations. The filing of false nominations itself is a violation of state penal law.[11] Tex.Rev.Civ.Stat.Ann. art. 6036c (Supp. 1966). Additionally, the filing of false nominations will apparently support a cause of action under the state's statutory[12] and common law.[13] Simply by veiling their grievance under the penumbra of a conspiracy charge, however, plaintiffs cannot convert what are in essence only violations of state law and what is primarily a matter of state concern into a federal antitrust violation. Norville v. Globe Oil & Ref. Co., 303 F.2d 281 (7th Cir. 1962); see Natural Gas Act, 15 U.S.C. § 717(c) (1963). See also note 7 *supra.*

## THE LITIGATION

The remaining allegations of plaintiffs' complaint which are involved in the present motion relate to efforts by defendants taken before the Railroad Commission to bring about a change in Commission rules and regulations and to litigation instituted or defended by defendants involving the validity of certain Commission rules and regulations. As to any efforts taken by defendants before the Commission to influence the Commission to alter old rules or promulgate new ones, it is clear that *Noerr, Pennington,* and *Okefenokee* preclude liability. Compare Ramsey v. United Mine Workers, 265 F.Supp. 388, 422 (E.D.Tenn.1967). Moreover, if the doctrines set forth by these cases are to have any meaning, plaintiffs are likewise precluded from recovering as damages any legal or court costs which they incurred in setting the rules aside. If defendants cannot be held liable in the first instance for persuading the Railroad Commission to enter a new field

11. However, a "private antitrust complaint is not the appropriate vehicle for state criminal laws whose enforcement is entrusted to state or local prosecutors." Schenley Industries, Inc. v. New Jersey Wine & Spirit Wholesale Ass'n., 272 F. Supp. 872, 885 (D.N.J.1967). See also cases cited in note 10 *supra.*

12. Tex.Rev.Civ.Stat.Ann. art. 6049d § 13 (1964); see Woods Exploration & Producing Co. v. Aluminum Company of America, 382 S.W.2d 343 (Tex.Civ.App. —Corpus Christi 1964, writ ref'd n.r.e.).

13. See Pan American Petroleum Corp. v. Hardy, 370 S.W.2d 904 (Tex.Civ.App.— Waco 1964, writ ref'd n. r. e.); *cf.* Lone Star Gas Co. v. Murchison, 353 S.W.2d

870 (Tex.Civ.App.—Dallas 1962, writ ref'd n. r. e.). The fact that damages are recoverable in a civil action based on state law does not mean perforce that damages are recoverable under the Sherman Act upon a similar showing. As stated by the Supreme Court:

"[The Sherman Act] does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce. * * * Whether the respondent's conduct amounts to an actionable wrong subjecting them to liability for damages under [state law] is not our concern." Hunt v. Crumbock, 325 U.S. 821, 826, 65 S.Ct. 1545, 1548, 89 L.Ed.1954 (1945).

rule which later becomes the subject matter of litigation, then it necesarily follows that via the back door they cannot be held liable for any loss they incurred while an order was in effect or any costs which they incurred in setting it aside. *Cf.* Fiumara v. Texaco, Inc., 204 F.Supp. 544 (E.D.Pa.1962). This conclusion controls as to any damages which plaintiffs seek to recover because of the litigation in Railroad Comm'n v. Woods Exploration & Producing Co., *supra*, in which the Texas Supreme Court by a six to three decision struck down a Commission order setting allowables for the field at a level lower than reasonable market demand.

 The remaining litigation identified by the parties in their briefs was instituted by defendants in an attempt to stop the drainage of gas from beneath their tracts because of rules prescribed by the Commission. At least one court has held that *Noerr* applies to such joint efforts taken in the courts by holding that "seeking lawful * * * judicial action does not violate the anti-trust laws, even if interstate commerce is involved and even if the purpose and effect is to curtail competition." Bracken's Shopping Center, Inc. v. Ruwe, 273 F. Supp. 606 (S.D.Ill.1967). But even if *Noerr* does not extend this far, the litigation of which plaintiffs complain cannot afford a recoverable element of damages, for it is clear that the suits were initiated with probable cause.

In Benz-Stoddard v. Aluminum Company of America, 368 S.W.2d 94 (Tex. 1963), suit was brought challenging the validity of a Railroad Commission order, which, by treating vertically-separated reservoirs separately for proration purposes, allowed small-tract owners multiple completions from a single well. There, under the challenged Commission order, a small-tract owner with a well located on a .115 acre tract had already produced more than seven times the amount of gas in place under her tract, and, if the order continued in effect, would, along with other small-tract owners, be allowed to further drain gas from beneath the larger, adjoining tracts. In the second suit, Railroad Comm'n v. Aluminum Company of America, 380 S.W.2d 599 (Tex.1964), suit was brought challenging the validity of the one-third —two-thirds proration formula as it applied to the Appling Field. The purpose of this latter suit was also to stop or at least curtail the huge drainage of gas from beneath the larger tracts of defendants. See note 5 *supra*. Both these cases raised points of first impression for the Texas courts. In the first case, the defendants were successful in advancing their contentions in the court of civil appeals. See Aluminum Company of America v. Benz-Stoddard, 357 S.W. 2d 809 (Tex.Civ.App.—Austin). In the latter case, the defendants were successful in both the trial court and the court of civil appeals. Railroad Comm'n v. Aluminum Company of America, 368 S.W.2d 818 (Tex.Civ.App.—Austin). The ultimate reversal in both cases by the Texas Supreme Court does not detract from the conclusion that defendants had probable cause to file the suits in question. It is not the final disposition of a case which determines whether probable cause existed at the *outset*. The judgments of the court of civil appeals show conclusively that defendants had probable cause to believe that the challenged Commission orders were invalid. Compare Citizen's Wholesale Supply Co. v. Snyder, 201 F. 907 (3d Cir. 1913); Bracken's Shopping Center, Inc. v. Ruwe, *supra*.

Therefore, it is ordered, adjudged, and decreed that the plaintiffs in this cause are not entitled to recover as damages any loss they might have suffered because of false production forecasts filed by defendants with the Texas Railroad Commission or any loss or expense which they might have suffered as a result of any litigation identified in this opinion concerning the validity of Railroad Commission rules, regulations, or orders. However, since there are other allegations in plaintiffs' complaint which, if true, would entitle them to a favorable judgment, summary judgment in favor

of defendants is limited to the elements of damage specified above. As to these:

This is a final judgment.

Counsel for defendants will draft and submit an appropriate order after first obtaining approval from counsel for plaintiffs.