WOODS EXPLORATION & PRODUCING COMPANY, Inc., et al.

v.

ALUMINUM COMPANY OF AMERICA et al.

Civ. A. No. 14669.

United States District Court
S. D. Texas,
Houston Division.

Oct. 2, 1969.

Arthur Mandel, of Mandel & Wright, and Levert J. Able, Houston, Tex., for plaintiffs.

Ross N. Sterling, and Leroy Jeffers, of Vinson, Elkins, Searls & Connally, Houston, Tex., for defendants.

*Memorandum and Opinion*

SINGLETON, District Judge.

This case involves alleged violations of section 1 of the Sherman Antitrust Act [1] and an attempt to recover treble damages under the provisions of the Clayton Act.[2]

Plaintiffs are Southeastern Pipe Line Company, a corporation, which after January 1, 1961, operated a pipeline between Appling Field in Jackson and Calhoun Counties, Texas, and the Tennessee Gas Transmission A-K line to which it was connected at Francitas, Texas; Woods Exploration & Producing Company, Inc., a corporation which operated as an oil and gas business; and Mr. Stanley C. Woods. Mr. Woods owned all of the stock of Woods Exploration & Producing Company, Inc. and Southeastern Pipe Line Company.

Defendants are Aluminum Company of America, commonly referred to as "Alcoa," a corporation that does business and has operations in Texas and other states. Alcoa owned, operated, and marketed gas reserves in Jackson and Calhoun Counties, Texas, which it owned and operated with Crown Central Petroleum Corporation, commonly referred to as "Crown," including gas reserves in the Appling Field. Crown primarily manufactures motor gasoline, lubricating and fuel oils, and does business and has operations in Texas and other states. Lavaca Pipe Line Company, commonly referred to as "Lavaca," is a corporation organized for the purpose of operating a pipeline, and is a wholly owned subsidiary of Alcoa, and Lavaca owned and operated a pipeline in the vicinity of the Appling Field in Calhoun County, Texas.

The co-conspirators in the case are alleged to have been F. E. Appling, a resident of El Campo, Wharton County, Texas, Carl E. Siegesmund (Pocantico Oil & Gas Corporation, long before the suit, succeeded to all of Siegesmund's interest), and Houston Pipe Line Company, a wholly owned subsidiary of Houston Natural Gas Corporation, which was organized for the purpose of operating a pipeline and for the distribution and processing of natural gas and other commodities. This company purchased gas produced in the Appling Field, owned by Alcoa, Crown, and Pocantico and, accepted delivery at the tail gate of Alcoa's Point Comfort Plant, and transported a portion of such gas to Monsanto Chemical Company in Texas City and Chocolate Bayou, Texas.

This controversy arises out of the discovery of, the production from, and the

1. 15 U.S.C. § 1 (1963).

2. 15 U.S.C. § 15 (1963).

sale and transportation of natural gas out of the Appling Field in Calhoun and Jackson Counties, Texas. This suit was originally filed in December of 1962. Initially, the thrust of plaintiffs' lawsuit centered around the claim by plaintiffs that defendants had conspired together to file false nominations with the Texas Railroad Commission in an effort to restrain trade in the production and marketing of natural gas and monopolized or attempted to monopolize the production and marketing of gas from this field. This Court granted defendants' motion for summary judgment on this phase of the case.[3]

Litigation between the parties arising out of the subject matter of this suit has been extensive.[4] Trial of the instant case was held after plaintiffs omitted from the case the false nominations feature as a result of this Court granting defendants' motion for summary judgment, Woods Exploration & Prod. Co. et al. v. Aluminum Co. of America et al., *supra,* and plaintiffs went to trial on their fourth amended petition. The trial was before a jury. The jury was asked two basic questions as follows:

*"Question No. One*

Did defendants Alcoa and Crown enter into an illegal contract, combination, or conspiracy to unduly and unreasonably restrain the trade or commerce of drilling for, producing, and transporting gas from the Appling Field?

*"Question No. Two*

Did Alcoa and Crown monopolize or attempt to monopolize or conspire with F. E. Appling, Carl E. Siegesmund, or Houston Pipe Line Company, or any one of them, or either of them, to monopolize any appreciable part of the trade and commerce of drilling for, producing, and transporting gas from the Appling Field?"

The Jury answered Question No. One "No" and answered Question No. Two "Yes." There were other questions asked and answered by the jury as a result of the affirmative answer to Question No. Two, but for the purpose of this Memorandum Opinion no useful purpose would be served to detail those questions and the answers of the jury.[5] In answer to the damage issue, the jury awarded damages to plaintiff Southeastern Pipeline Company in the total amount of $142,759.00, and awarded damages to Woods Exploration & Producing Company in the amount of $500.-00.

This Court grants defendants' motion for judgment notwithstanding the verdict of the jury with respect to its answer to Question No. Two.[6] In so doing, this Court, for the reasons set forth in this opinion, holds that there was insufficient evidence to support the jury's findings to Question No. Two, and the

3. Woods Exploration & Prod. Co. et al. v. Aluminum Co. of America et al., 284 F.Supp. 582 (S.D.Tex.1968).

4. See generally Railroad Comm'n v. Aluminum Co. of America, 380 S.W.2d 599 (Tex.1964), reversing 368 S.W.2d 818 (Tex.Civ.App.—Austin 1963), and Woods Exp. & Prod. Co. et al. v. Aluminum Co. of America et al., *supra.*

5. With respect to the jury's answers to the other questions answered, this Court is of the opinion that there is sufficient evidence in the record to support the jury's answers to these questions.

6. See Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969) (en banc) as it relates to the standard to be used for motions for directed verdict or motions notwithstanding the verdict in federal cases. Also, Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) wherein the Supreme Court on this particular point held that the standard to be used in jury trials in federal courts involving the Sherman Antitrust Act, in connection with motions for directed verdict or motions notwithstanding the verdict was that "the [district court] was, of course, bound to view the evidence in the light most favorable to the [nonmoving party] and to give it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn."

Court should have granted defendants' motion for a directed verdict at the close of the evidence.

The natural gas involved in this lawsuit is found in what is known as the Appling Field in Jackson and Calhoun Counties, Texas, and a part of this field lies under Carancahua Bay in those counties. The Appling Field was discovered in 1953. The discovery well in this field was completed as a gas producer in the Mid-Kopnicky in 1953. Defendants in this case own or have leases on approximately 90% of this field. On the perimeter of the bay is an area known as the Carancahua Townsite and generally consists of vacant, small town lots. The acreage of these lots amounts to considerably less than one-half of one per cent of the entire acreage of the field. Around 1960 plaintiffs began leasing up these small lots and commenced drilling operations and completed nine or ten gas wells. The principle sand in the Appling Field is known as the Mid-Kopnicky, Segment A, and is the deepest producing sand and contains approximately 80% of the entire gas reserves in the entire area.

Plaintiffs claim that as a result of the agreements the defendants had among themselves and with the alleged co-conspirators, defendants not only attempted to prevent plaintiffs from obtaining leases on the town lot sites, but also after plaintiffs had obtained such leases defendants refused to deal with plaintiffs to enable plaintiffs to drill for, complete, transport, and market plaintiffs' gas, and defendants harassed plaintiffs in plaintiffs' efforts to drill and complete plaintiffs' wells. As stated, plaintiffs did complete nine or ten gas wells. Plaintiff Southeastern Pipeline Company built a pipeline and transported through this pipeline plaintiffs' gas for marketing purposes. However, plaintiffs contend that defendants should have allowed plaintiffs to transport gas through defendant Lavaca Pipeline Company's pipeline, or, if not, that in connection with plaintiffs building its pipeline defendants caused plaintiffs to spend more money than plaintiffs should have had to spend by forcing plaintiffs to select a longer and more costly route for its pipeline, and that defendants' harassment of plaintiffs in connection with plaintiffs' drilling operations cost plaintiffs unnecessary additional money.

Plaintiffs allege that the combination or conspiracy and the attempt to monopolize on the part of the defendants originated with various agreements executed between Alcoa, Crown, and Appling. These agreements are summarized in plaintiffs' Exhibits 2A, 3A, 167A, and 25A. It is plaintiffs' contention that after these agreements were executed, defendants Alcoa and Crown and the alleged co-conspirator F. E. Appling used the rights they acquired in connection with these agreements, individually and jointly, to effect such a combination or conspiracy to unduly restrain trade as is forbidden by Section 1 of the Sherman Antitrust Act, and to monopolize, or attempt to monopolize, or to conspire to monopolize as is forbidden under Section 2 of the Sherman Antitrust Act.

Another agreement plaintiffs allege to be a part of their case is the right-of-way agreement executed by F. E. Appling and Lumar Gas Pipeline Corporation, plaintiffs' Exhibit No. 83. Plaintiffs' Exhibits 2A, 3A, 167A, and 25A were summaries dictated by counsel and the Court, summarizing joint operating agreements and amendments between Alcoa and Crown, agreements relating to transporting defendants' gas through Lavaca Pipeline Company's pipeline, as well as the agreements relating to assignments of leases between the parties, and the basic agreement between Alcoa and F. E. Appling concerning Mr. Appling's leasing to Alcoa of property that he owned in the area and his work for Alcoa in obtaining leases from other landowners and his retention or assignment to him of a royalty interest in connection with such leases. Plaintiffs' Exhibit No. 83 is an agreement between Mr. Appling and Lumar Gas Corporation in connection with which Mr. Appling granted to Lumar an easement to

lay, construct, maintain, etc., a six inch pipeline for the transmission of natural gas over lands belonging to Mr. Appling in Jackson County, Texas. This agreement contained a provision obligating Lumar to accept for delivery and transportation, and to purchase or acquire for delivery and transportation, natural gas from wells situated in the area, which purchases were to be made only from the wells which were first approved and accepted by Mr. Appling; and if Lumar breached this particular covenant the right-of-way and easement would revert to Mr. Appling, together with the pipeline.

Plaintiffs further contend that as a result of the alleged conspiracy and combination resulting in the agreements mentioned above, the defendants combined or conspired to boycott and concertedly refused to deal with plaintiffs Woods Exploration and Producing Company and Stanley C. Woods in that defendants refused to unitize any of plaintiffs' leases of various townsite lots with those of defendants in the Appling Field, or to buy or to transport plaintiffs' production from wells drilled by plaintiffs on these townsite lots; that defendants combined or conspired to control or attempt to control the terms and conditions of transporting plaintiffs' gas from the Appling Field for the purpose of blocking transportation of the gas from the Appling Field; and that F. E. Appling knew of the policy of defendants to prevent or restrict production from the townsite lots in the Appling Field, and pursuant to such knowledge and as a result of the rights he acquired in the right-of-way agreement, plaintiffs' Exhibit No. 83, he caused Lumar Gas Corporation to refuse to enter into a contract with Southeastern Pipe Line Company, and caused Lumar Gas Corporation to breach an agreement, if any, for transporting plaintiffs' gas over its line, and required Southeastern Pipeline Company to file condemnation proceed-ings for a right-of-way over F. E. Appling's land.

As pointed out above, plaintiff Southeastern Pipeline Company did construct its line and in connection therewith did obtain a right-of-way over Mr. Appling's land but had to resort to condemnation proceedings to do so.

With that factual background, we now turn to a consideration of what this Court considers to be its reasoning [7] and the law applicable thereto concerning this Court's conclusion that as a matter of law defendants are entitled to judgment.

At the outset of this case we are confronted with three questions: (1) What is the relevant market; (2) was there in this case monopoly power as defined by the Supreme Court, that is, power to control prices or exclude competition; and (3) was the monopoly power wilfully acquired and maintained or was it a result of an historic accident?

A determination of the relevant market, "both as respects products and as concerns geographical area" needs to be made in actions for violation of section 2 of the Sherman Act. See Case-Swayne v. Sunkist Growers, Inc., 369 F.2d 449 (9th Cir. 1966). There is no question that natural gas is the relevant product market in the instant suit.

As to the relevant geographic market, this Court looks to the guidelines laid down by the Supreme Court in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). According to the *Brown Shoe* case, we must determine whether or not the Appling Field corresponds to the "commercial realities" of the industry and whether or not it is economically significant. It is true that the geographic market involved may be as small as a single metropolitan area or even one individual businessman. See Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

7. In addition to those already stated in this Court's opinion in Woods Exp. & Prod. Co. v. Aluminum Co. of America, 284 F.Supp. 582 (S.D.Tex.1968).

Considering the "commercial realities" of the oil and gas industry, however, this Court is convinced that the Appling Field does not constitute the relevant geographic market for natural gas in the area under consideration. All of the gas produced that was not used for the producer's own purposes was transported and sold in other areas. Additionally, due to the heavy regulations present in the natural gas industry,[8] neither Alcoa nor Crown, individually or jointly, or through F. E. Appling could establish any economic barriers which significantly impeded the entry of Woods or any other operators into the Appling Field. See Case-Swayne v. Sunkist Growers, *supra*.

The preceding point overlaps into the second question which concerns monopoly power. In this Court's opinion none of the alleged co-conspirators had the power to control prices or exclude competition in connection with the production of natural gas in the Appling Field. It is undisputed that Mr. Woods produced and marketed all of the gas that the Texas Railroad Commission permitted him to produce from the wells he drilled. The lack of monopoly power on the part of the defendants is apparent.

Plaintiffs rely heavily upon the case of Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir. 1964), in which the Ninth Circuit draws a distinction between monopolization and attempts to monopolize. In attempts to monopolize, the Court rejected the view that probability of actual monopolization is an essential element of proof, where it stated:

"Such a probability may be relevant circumstantial evidence of intent, but the specific intent itself is the only evidence of dangerous probability the statute requires—perhaps on the not unreasonable assumption that the actor is better able than others to judge the practical possibility of achieving

his illegal objective." Citing Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1906), and other cases.

The cases that Lessig relies on speak in terms of "dangerous probability" of the monopoly, etc., coming to pass. However, Lessig seems to go a step further. It holds that a finding of specific intent to monopolize is sufficient notwithstanding the probability of success. This Court refuses to take that additional step. There is no possibility, let alone probability, of monopolization in the Appling Field.

The Lessig case involves price fixing, which is far removed factually from the problem presented by this case. In addition, the circumstantial evidence in this record that would support a finding of specific intent on the part of the defendants is not persuasive to this Court.

In the final analysis, this Court must hold that the conduct of the defendants does not fit the definition of the offense condemned by section 2 of the Act. In addition, this Court holds that the Appling Field is not the relevant geographic market; that under the definition of the word "monopoly" these defendants as a matter of law lack the power to control prices or exclude competition; that whatever may have been placed within the control of the defendants in this case was the consequence of an historic accident (the discovery of the Appling Field); that their efforts to protect the natural gas they discovered by this historic accident was neither exclusionary, unfair, or predatory; and that they, and each of them, were not disempowered to, defend their position fairly. This Court would again say that efforts before the Railroad Commission to prevent the drainage of gas from under the Appling Field by the small tract operators, including Woods, was fair. All of the other acts

8. This Court has already discussed extensively the heavy regulation in the oil and gas industry. See Woods Exp.

& Prod. Co. v. Aluminum Co. of America, 284 F.Supp. 582 (1968).

and conduct attempted to be proved by plaintiffs amounted to nothing more than conduct for which plaintiffs might have a cause of action under some tort theory.

Additionally, the agreements which plaintiffs contend brought about the monopoly and the combination in this case are the usual and customary types of agreements used in the oil and gas industry, that is, joint operating agreements, pooling agreements, unitization agreements, lease agreements, right-of-way agreements, and such agreements do not result in a limitation of the supply of gas in interstate commerce or any price fixing of gas. If the Sherman Antitrust Act were to be literally construed as plaintiffs contend, it would condemn any type of joint operating agreement, or pooling agreement, or unitization agreement. In considering the "commercial realities" of this business, such would be an absurd result.[9]

Further, this Court is persuaded by the reasoning of the Supreme Court in the case of Appalachian Coals v. United States, 288 U.S. 344, 378, 53 S.Ct. 471, 77 L.Ed. 825 (1932). This case was an action brought to enjoin a combination alleged to be in restraint of interstate commerce in bituminous coal and an attempted monopolization of a part of that commerce in violation of Sections 1 and 2 of the Sherman Antitrust Act. The defendants, other than the Appalachian Coals, Inc., were 137 producers of bituminous coal in the Appalachian territory. These producers created an exclusive selling agency, Appalachian Coals, Inc., and all of the capital stock of that company was owned by the 137 producers in proportion to their production. The uniform contracts, separately made, of each of the defendant producers constituted the company as an exclusive agent for the sale of all coal which the producers mined out of the Appalachian territory. The government in the case contended that the plan adopted by these producers violated the Sherman Antitrust Act in that it eliminated competition between defendants themselves and also gave company power to substantially affect and control prices of bituminous coal in interstate commerce. Although factually the case is dissimilar, certainly the subject matter involved and the principles announced by the Supreme Court relating to that subject matter seem appropriately similar to the instant case. What the Supreme Court said about the Sherman Antitrust Act, what it was designed to do, and the necessity of looking at the particular industry involved support this Court's reasoning of the application of the Sherman Antitrust Act to the oil and gas industry and the activities of the defendants in the instant case. The Supreme Court reversed the trial court which had granted the injunction sought by the government, holding that the plan violated the Sherman Antitrust Act.

"There is no question as to the test to be applied in determining the legality of the defendants' conduct. The purpose of the Sherman Antitrust Act is to prevent undue restraints of interstate commerce, to maintain its appropriate freedom in the public interest, to afford protection from the subversive or coercive influences of monopolistic endeavor. * * * The decisions establish, said this Court in Nash v. United States, 229 U.S. 373, 376, 57 L.Ed. 1232, 1235, 33 S.Ct. 780, 'that only such contracts and combinations are within the act, as by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade.' (Citing numer-

9. A discussion of this particular problem is found in an article by Hardwicke, Antitrust Laws, et al. v. Unit Operation of Oil or Gas Pools (1961); and an article by Searls, "Antitrust and Other Statutory Restrictions of Unit Agreements", Third Annual Institute on Oil and Gas Law and Taxation, Southwestern Legal Foundation; and by Jacobs, Unit Operation of Oil and Gas Fields, 57 Yale L.J. 1207 (1948).

ous cases.) In applying this test, a close and objective scrutiny of particular conditions and purposes is necessary in each case. Realities must dominate the judgment. The mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it. 'The legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains.' * * * The question of the application of the statute is one of intent and effect, and is not to be determined by arbitrary assumptions. It is therefore necessary in this instance to consider the economic conditions peculiar to the coal industry, * * * in relation to market prices and other matters affecting the public interest in interstate commerce in bituminous coal."

Finally, this opinion and the Court's action in this case must be taken together with this Court's opinion and reasoning in Woods Exploration & Producing Co. et al., v. Aluminum Company of America et al., supra. Simply stated, the activities of the defendants in this case, when considered in conjunction with the discovery of, the production of, the transportation of, and the marketing of oil and gas, do not lend themselves to a cause of action under the Sherman Antitrust Act. There is no price fixing or attempt at price fixing involved. The product dealt with is one that is heavily regulated both in this case by the State of Texas and, with respect to marketing and price, by the Federal Power Commission. Efforts on the part of these agencies to protect the public in the conservation of this resource is necessary and, of course, monopolistic in a sense.

It would seem to this Court that courts should be reluctant to hold that the Sherman Antitrust Act applies to the type of agreements used in this case. They are the same type of agreements used in almost all activities in the oil and gas field, where the development of the product is regulated and the output is controlled, and the rights of the public are well protected. The ultimate recovery of the product is necessarily controlled, but not for the purpose of restraining trade or reducing competition of a character or a type contemplated by the antitrust laws.[10]

This Court will grant defendants' motion for judgment notwithstanding the verdict as to the jury's answer to Question No. Two. Defendants' attorneys will prepare an appropriate judgment, submit same to plaintiffs' attorneys for approval as to form, and the Court will immediately sign and enter same.